## THE PLYMOUTH.

### THE LANGHAM.

(Circuit Court of Appeals, Sixth Circuit.   April 12, 1916.)

No. 2724.

COLLISION ⊛═95(6)—STEAMER AND BARGE IN TOW—FAULT.

A collision in St. Clair river on a clear and calm day between the second of two barges in a tow which was turning to go down the river and an upbound steamer *held* due to faults on the part of both vessels; the barge for using an insufficient towline, which parted when she was partly turned, causing her to move across the river and against the steamer, and also for not anchoring at once, and the steamer being in fault for not reducing speed when at a distance of three-fourths of a mile it became apparent that the barge was not following the other vessels of the tow.

[Ed. Note.—For other cases, see Collision, Cent. Dig. §§ 200–202; Dec. Dig. ⊛═95(6).]

Appeal from the District Court of the United States for the Eastern Division of the Northern District of Ohio; William L. Day, Judge.

Suit in admiralty for collision by J. Joseph McTigue, owner of the barge Plymouth, against the steamer Langham, John J. Adams, claimant, with cross-libel. Decree against the Plymouth, and libelant appeals. Modified.

For opinion below, see 211 Fed. 763.

D. E. Warner and L. B. Ware, both of Cleveland, Ohio, for appellant.

R. G. McCreary and Goulder, White & Garry, all of Cleveland, Ohio, for appellee.

Before WARRINGTON and KNAPPEN, Circuit Judges, and HOLLISTER, District Judge.

HOLLISTER, District Judge.   Libel by McTigue, owner of the Plymouth; cross-libel by Adams, owner of the Langham—both vessels having been injured in a collision between them in the St. Clair river.

The empty barge, Plymouth (213 feet long), with donkey engine forward, and two anchors, about 1,200 pounds each, on the forecastle deck, lay at the dock below the mouth of Belle river, which flows into the St. Clair just below Marine City, Mich.   To the southeast lies Fawn or Woodtick Island toward the Canadian side of the main channel, here about 1,800 feet wide.   For a few feet between the island and the deep channel, the water is about 5 feet deep.

The steamer Adiramled (300 feet long), having the barge Melbourne in tow (168 feet long), came up the St. Clair and took the Plymouth also in tow; the Plymouth's towline being fixed to the stern of the Melbourne.   The towlines were each 300 feet long.   The distance from the bow of the Adiramled to the stern of the Plymouth was about 1,226 feet.   The Adiramled proceeded up stream sufficiently to straighten out the tows and get headway for them—about 1,500 feet—and swung out into the stream, her helm and the helms of the tows ported,

for the purpose of gradually turning around and coming down stream.

The steamer Langham, a wooden freighter 281 feet long by 48 beam, laden with coal, was coming up stream in about the middle of the channel at about 10 miles an hour. It was toward the middle afternoon of a bright, clear day (August 21, 1909), with little wind. The Adiramled saw the Langham when she was abreast of the Salt Works on the American side about a mile and a half away. The Langham saw the entire maneuvers of the Adiramled and her tow, and there were no obstructions of any kind to prevent a full view by both parties.

The Adiramled and her tow had the right of way, and signaled to go down on the Canadian side. The Langham, however, signaled to go up on that side, and the Adiramled consented. The Adiramled was then headed down stream; the Melbourne had nearly come around, and the Plymouth had not yet turned, but lay athwart the river approaching midstream.

Upon consenting to give the Langham the Canadian side, the Adiramled ported her helm to carry her and her tow toward the American side, and signaled her engineer to go ahead strong. He did so, and the line between the Melbourne and the Plymouth parted, leaving the latter at about midstream and headreaching slowly toward the Canadian side. She was under way, but not sufficiently to respond to her tiller hard aport. The current was about a mile and a half an hour.

When the first interchange of signals was made between the Adiramled and the Langham, the latter checked some, and checked again, down to about 4 miles an hour, when the Adiramled consented to give her the course, and there was, at that time, a full half mile between the vessels, each being about in midstream, the Langham somewhat nearer the Canadian side and toward the island. The Adiramled, slowly turning toward the American side, followed by the Melbourne, which had come around and was headed downstream, had proceeded as far from the Plymouth as, at least, 1,500 feet, when the Langham passed the Adiramled at a distance of about 200 feet; the Plymouth slowly proceeding toward the Canadian shore and drifting. When the Langham passed the Melbourne, the captain of the Langham saw that the towline between the Melbourne and the Plymouth had parted. Seeing, then, that if he continued on his course he could not clear the Plymouth, he backed his vessel hard for two or three minutes, and she brought up in the shallow water near the shore of the island. At that time the vessels came together at practically right angles, the bow of the Plymouth striking about 35 feet abaft the stem of the Langham.

When the line broke, the captain of the Plymouth ran forward to the donkey engine, and blew danger signals continuously until up to the time of the collision. These signals could certainly be heard a mile and a half away. When the passing signals were exchanged, the distance between the Langham and the Plymouth was in the neighborhood of three-quarters of a mile; and when the Langham passed the Adiramled, the distance between the stern of the Melbourne and the Plymouth, now drifting broadside down stream with some, though slight, headway, was gradually increasing, so that at that time there must have been in the neighborhood of at least 1,500 feet between the Langham and the Plymouth.

At a distance (by the weight of the evidence) of three-quarters of a mile the Langham knew something had happened to the Plymouth. She saw her lose the continuity of her course in not following the Melbourne. Her captain, although he says he did not hear the danger signals, saw the puffs of steam; but he must be held to have known, as did his mate, Gleason, that something was wrong with the Plymouth, and that she might drift into his course. Nevertheless he proceeded, and it was not until he was abreast of the Melbourne and actually saw what had happened that he reversed and backed in the effort to escape a collision which had become inevitable. His own story tells how the collision occurred:

"Q. Isn't it a fact, Captain, that the Plymouth didn't follow the Melbourne after you agreed that you would take the Canada side and she would take the American side, and as soon as the Adiramled started toward the American side? A. We were in a position that we couldn't do anything but back up: she was heading straight across the river. Q. When did the Plymouth stop following the Melbourne? A. Immediately after the Melbourne got straightened down the river. Q. Now, with reference to the time you exchanged the signal of one blast? A. About a half a mile apart. Q. That is, the Adiramled was half a mile away when the Adiramled (Plymouth) stopped following the Melbourne? A. I don't know anything about that; that is the time I exchanged whistles with the Adiramled. The Plymouth didn't come around at all. Q. When, with reference to the exchange of whistles, did she stop following the Melbourne? A. I suppose a minute or two. Q. And at that time the Langham and the Adiramled were half a mile apart, were they? A. Yes. The Court: Didn't you say that this Plymouth wasn't following the boat immediately in front of it, and you didn't discover it until you got abreast of that second tow? A. Well, they were coming around making the turn in the river. I didn't know what the reason was, but she wasn't following. I couldn't tell why she didn't come around, but I saw her in that shape heading up the river, and they didn't come around any more, but the towline was gone when I came up abreast of the Melbourne; then I saw there was but one thing we could do, and that was to back up, because I couldn't recover myself to try to go under his stern. We fetched up on the Island and the Plymouth came in and hit us. * * * The Court: If you were keeping the proper sort of lookout, why didn't you see that the rope was gone? A. It happened so quick—we didn't expect it was going to part. The Court: I mean after you exchanged the one blast, why didn't you discover that the Plymouth was drifting? A. Couldn't see the line. The Court: You could see the Plymouth, couldn't you? A. Yes; he was a little to the westward of the Melbourne. Q. Didn't the maneuvering of the Plymouth indicate that something was wrong? A. No, sir; not until we got up and was alongside of the steamer did I discover the line was parted. Then I couldn't recover ourselves, as we were swung to the Canada side. If I undertook to go under his stern, I would have run into the Plymouth; that is the reason I kept on backing."

The captain of the Langham ignored the plain fact that the Plymouth, with no means of propulsion, had left her natural course and might block his course. He paid no heed to the Plymouth's danger signals, of which he saw the steam, and which there is no reason he `could not have heard. He did not again check, after getting permission to take the Canadian side, until, when abreast of the Melbourne, he actually saw that the line had parted. He backed his vessel then with great vigor, and, bringing up on the island, could go no further. As it was, the Plymouth nearly cleared the Langham. It is probable he thought, when he saw the Plymouth was not coming around, that

232 F.—44

he could get between her and the Canadian shore. When he realized that he could not, he tried to back out of the way.

We think, if he had acted on the warning the appearance of the Plymouth and her danger signals gave him, and had proceeded with the caution which the circumstances required, he could have regulated his speed so as to have passed under the stern of the Plymouth. But, whether he could have done that or not, we think he ought not to have proceeded at a speed so great that he could not get out of the way of a helpless vessel drifting into his water, whose condition he knew, or ought to have known, when he was three-quarters of a mile away and could easily handle his boat going against the current.

While the testimony is conflicting, and the relative positions of the boats and matters of time and distance are necessarily uncertain, yet we think the story outlined above is established by the great weight of the evidence. In addition to other testimony, the negligence of the Langham is shown by the evidence of the captain himself. We think the Langham was at least partly to blame for the accident. So was the Plymouth, primarily.

Some effort was made to show the Plymouth's nine or ten inch hawser was a good rope; but its history and service were scarcely disclosed, and, more important still, its parts had disappeared. It was, however, conclusively shown that when the Adiramled increased her speed toward the American side, which undoubtedly was the cause of the break in the hawser, there was no jerk, or unusual strain, upon the hawser. The inference cannot be escaped that, if it had been in good condition, it would not, with the strain put upon it—the Plymouth going light—have broken.

The appellee claims negligence on the Plymouth's part in not anchoring when the towline parted. Circumstances must determine the propriety, or want of it, of the conduct of the crew of a vessel relative to the manipulation of anchors. There is evidence tending to show that an anchor should have been on the cathead, ready to be cast overboard. This could be done in a fraction of a minute. There is evidence that the cathead is no place for an anchor, particularly when being towed. It is clear that, when a barge is moored to a dock, the cathead is no place for an anchor. It would seem that anchors, whether a boat is at a dock or under way, should not be permitted to swing from hawse holes. There can be no doubt that when at the dock the anchors were properly enough on the forecastle deck. The Plymouth had just left the dock. The weather was fine. There was no sea. Apparently, there was no reason for the captain of the Plymouth, or any one of her crew, to suspect the condition of the towline. There was no reason to believe, even after the towline parted, that the Langham, three-quarters of a mile down the river, would have any difficulty in keeping out of the way. Still we think that the captain of the Plymouth, knowing his vessel was adrift and reaching into the Langham's course, and having steam up on his donkey engine, could have cast his anchors, or one of them. We cannot say that this would have averted the accident. We think it might have done so. It being the duty of the Plymouth to do everything it reasonably could to avert possible accident, she should, at least, have tried to come to anchor.

In the court below the entire blame was ascribed to the Plymouth, but, as we think both vessels were blameworthy, the damages and the costs below should be equally divided between the parties, with costs of this appeal to appellant; and the case is remanded, with directions to the District Court to enter a decree consistent with this opinion.